Next case for argument is 22-1590, Ficep Corporation v. Peddinghaus. Ready? Mr. Lally, welcome. Please proceed. Thank you, Honor, and may it please the Court. The first inquiry, this is obviously a Section 101 case, and the inquiry is, is this directed to statutory subject matter? And I think kind of from the get-go, that question is easily answered with a yes. I mean, this is directed to a manufacturing process, and that is a Section 101. Explain something about patent to me. How does this patent not cover an auto body assembly line? It would, well, it wouldn't cover an assembly line because you have to manufacture the components, but it would cover, in the context of auto manufacturing, the manufacture of components where you use the intersection parameters in the manufacture of the component with a machine that's specialized and capable of doing that. It is not limited to building. But why wouldn't a robot which assembles the parts of the body on the auto assembly line, using those parameters, not do the same thing as your patent? Because the claims recite the manufacturing machine making the component based on the intersection parameters. So if it's automated assembly, but the components aren't based on the intersection, that's automated assembly. What this patent is about is not that. It's you're going to make one component. Isn't that unified body that's produced a component of the automobile? The unified. So the unified body is put together. But then that body would need to be built based on its, if that's the component, based on its intersection with some other part, right, in the manner as claimed. And it would have to be out of the 3D model. I mean, there's a lot more going on there. So it could cover an auto body assembly. The part that produced, where they produced the body by taking three different big pieces and matching them together. That's what I was reading when I read the patent. Yeah, the answer is no, Your Honor, because you would need to make the individual parts. So you're making one component, and you're making it based on the intersection with a component that's not being manufactured now. Subsequent assembly does happen with both structural steel beams and auto parts. But if it's automated assembly, frankly, there's no need to. So just what happens in the infringing devices, my client's devices, the devices found to infringe, you've got, for example, a steel beam, and you etch automatically the shape on it. And what happens is on the floor, they take them, and you can line it up, and you can assemble it precisely, right? So you know exactly where it intersects. If you're using a robot, you don't need to do that, because the robot's going to do it for you without the marking. So probably not in that context, Your Honor. But back to the point is, even if it did cover that, it's directed to manufacturing. And that is statutory subject matter, which is like deer. Because in Diamond v. Deere, plainly that case, that claim, which is reproduced in our reply brief, is to using the Arrhenius equation to determine when to open the door on a rubber press, if that's the right word, and automatically open the door. The Arrhenius equation, right? They were opening doors. They were doing it by hand. They were using the Arrhenius equation. And the invention there was that. And the Supreme Court said, that's a process for curing rubber, right? Because that's what the claim says. And if one compares it to Fluke, Fluke was an alarm in, I think, a petrochemical plant, but the claim wasn't limited to that. It was calculating the number, whether it was for scientific purposes or something else. And so this is a very rare case, because, Your Honor, I've read all the 101 cases I could lay my hands on, at least. And it's daunting how often patents are invalidated under 101 by this court and other courts below this court. And the fact is. It's daunting, but that's our governing precedent right now. It is. But none of them are manufacturing processes. None of them. They are all things like detecting fraud in a credit transaction. I mean, the list goes on and on. Things like washing an airplane in Echo Services, well, that was statutory because it's directed to it. And so when the Solicitor General filed their brief on Wednesday in the interactive wearables petition for certiorari, they advocated for certiorari because they said the question should be, is it directed to, in that case, the personal wearable interactive device? Or is it directed, you know, how do we do that? And the Solicitor General said it was. This case is easier. I mean, there's a lot of software going on here. This case is about manufacturing. You know, the SG's brief is not something we're governed by. We're governed by our own precedent. We have lots of precedent that says automating something that had previously been done by hand is not really the sort of thing that's eligible for the patent system. That's just nothing more than perhaps, in a larger sense, like a mental step type of problem. Right. And this is plainly not. I mean, I question that because it seems like if that's all that was done, it would be obvious and invalid anyway. Well, that's a different problem, perhaps, with these claims. But for what we have right now, I mean, this patent, it's a very short specification. That's true. I call it thin, and, you know, the figures don't show me a lot. But it's pretty clear to me that the whole point of this was you had a CAD design model that contains information, and you're trying to transfer that information to some manufacturing machine. And before, a lot of that had to be done by a person doing that. And now this invention's insight is, well, let's avoid human intervention. Let's automate that process of extracting data out of a design model and feeding it into a manufacturing machine. And if that's an accurate summary of the claimed advance by the inventor of these claims, then what we have here is another example of automating something that had previously been done by man. And we have multiple cases. In Ray Killian's recent example where we've said, no, sorry, we can't get a patent on that under Section 101. Under our understanding, it would be our abstract idea exception. Yes, and plainly, this is not merely automating. And so if I could just slightly divert before I go directly there, Your Honor, the district court was kind of all over on what the idea was, but kind of landed where Your Honor had said at identifying, extracting, and transferring data from a design file. And Peddinghaus in briefing adopts that definition on pages 18, 28, and 42. But when it comes to things like preemption and whatnot, they can't do that. That's not the idea because, of course, that's not being preempted. And so they say the idea is creating a design model that includes dimensions, and they say intersection points. It should be intersection parameters that define an intersection because that's Claim 7. They say the components, it should be one component being manufactured as it intersects with a component that's not yet being manufactured of a three-dimensional design. Identifying and extracting that information from the three-dimensional model and then converting that information to instructions for manufacturing the physical object and transmitting those instructions to the manufacturing machines, which are specially, they don't say this part, but which are specially adapted to receive them because that didn't exist in the prior art before. And I would suggest that that is pretty darn concrete. It's still a little bit too broad, but it's pretty darn concrete. And this was not merely automating because what would happen, I mean the only evidence about what was conventional came from BCHEF, notwithstanding the proof over here. But what would happen conventionally is they would be manufacturing these things and they would take them off the line. They would use hoists to take them off the line. They would get a 2D printout, not the three-dimensional drawing. They would determine by hand, okay, we think this is where the intersection is. They would write it out. Highly skilled operators have to do this, subject to reliability and quality problems, of course. They would get a crane and put it back on the line and then run it on through. And so lots of problems with that, as it turns out. You need separate layout stations to take it off the line and put it there, so it requires a lot more manufacturing floor space. You need special operators who can read those drawings and do the markings and the speed, the reliability, the cost. And the manner of doing it is not the same. It is fundamentally different to derive the information from the three-dimensional model than it is to take a printout and a ruler and try and figure out where it is, which is one of the other fundamental errors in both the district court opinion and in Peddinghaus' briefing, which is a predicate. They say that this was simply taking the data out of the three-dimensional CAD model because it was in there. It was not in there. And so two parts of this, Your Honor. First, there are two kinds of information that the patent talks about. One is things like dimensions. How long is the steel beam? That information is in the CAD model conventionally. And you could take it out and you could cut it. And the patent talks about you need to do that automatically to reduce error. That's not why we're here. That's not the invention that we're here talking about. The second part is, and we're also going to include intersection parameters, and they say also include intersection parameters. And they say extract dimensions, then identify and extract intersections because the intersections weren't there. And that's how it's described in the patent. But were there any ambiguity on that point, Your Honor? There was evidence from FECHA that affirmatively established that the intersection parameters that define the intersection are not in conventional CAD models, which is why this was such a big deal that was lauded in the industry when it came out. This is huge. They can get it out of the CAD model even though it's not there. Dimensions, sure, that's not why this patent was granted. Intersection parameters that define the intersection, they were not there. So this isn't simply getting and transferring data. You have to first, at least as compared to what was conventional, get it. Now, after this patent, people copied. This is all in the record. So where in the claim does it talk about whatever, some computer somewhere doing the derivation work to figure out where the intersection points are for the intersection parameters? That is where in the processor identifies a plurality of intersection parameters. What's the site to the spec? This is claim 7. I don't have the line number in front of me, but it's about the fifth, sixth limitation. I was a little confused. I couldn't tell from your arguments whether it's at this part of the claim where the processor identifies a plurality of intersection parameters where the intersection parameters get derived, or are they already kind of embedded in the design model creation step in the first step of your apparatus where the computing device is adapted to create a design model? Because it felt like in some parts of this patent you're talking about the design model comes ready-made with the intersection. Okay, so thank you, Your Honor. One has to distinguish conventional with post-patent infringement. Conventionally, you had to derive it. It wasn't there. They didn't use them in the manufacturing line. It wasn't there. You had to derive it. After Fichep's invention, and there's proof of this in the record, notwithstanding that Fichep doesn't have it, after Fichep's invention, the CAD model designers copied and said, oh, dang, we should put that in. Apologies for the informality. We should put that into the CAD model. And so identifying now means finding it in the CAD model. But if one is looking at what happened in the prior art or this change that this made, it wasn't in the CAD model. Okay, so then it sounds like you're not saying the processor that identifies the plurality of intersection parameters is where the intersection parameter derivation work is occurring. It's actually at the first step. It can be in either. It can be either. Okay, this is a broad kind of vague claim. So now it's moving around. It's not moving around, Your Honor. But you said it could be either. Yes, claims often cover more than one embodiment of an impringement and you have to identify the intersection parameters and have them in the model, and that never happened in the prior art. And so Fichep did it. It columns 4, 5, and 6 in different places. The patent talks about how a design model typically includes a lot of information, including intersection parameters. That is a description of the preferred embodiment, Your Honor. And before that, it talks about how you extract dimensions and then you have to identify and include intersection parameters. And at the beginning of the patent, it refers to, in column 1, at lines 49 to about 55. Above that, it talks about use dimensions, use them automatically, and then to increase efficiency, include intersection parameters because they weren't used in manufacturing before. It seems to me that what you're patenting is the question rather than the answer. That is, the question is, what's the intersection parameter within the CAD program? And then somebody else looks at it and says, oh, well, here's the answer. No, what the patent is, is getting them and using them during manufacture, using a machine that can do it, which allows it to be done on the manufacturing line, which is why the claim is directed to the manufacturing system, not the identification of intersection parameters. No, no, I'm not saying that. So you said getting them when you answered my question. That's the question. The answer is the algorithm that does it within the CAD program. Right. The invention is not how intersection parameters are identified. It's that they are identified and used during manufacture, something that never happened before, at least not using a manufacturing machine. It could only be done by hand. There was no way to do it otherwise. Okay, why don't we hear from the other side and then we'll go through a couple more minutes. May it please the Court, Nathaniel Love for Peddinghaus Corporation. I'm going to start with Judge Chen's question about intersection parameters, and there certainly is some confusion about exactly what the invention is. One of the arguments that counsel has made is that the invention or the innovation or the inventive step at Part 2 of ALICE is that the identification of intersection parameters is done differently than what was done by human operators. But if you look at the claim, and you were looking at the language just now, there's no description of how that process is actually done. And what they told the district court, and this is at Appendix 214, is that the invention covers any way that a computer might identify the intersection parameters. So it is, to your point, Judge Wallach, it's just about the whole question. It's not about some specific way of doing it. The other point about intersection parameters that counsel raised was whether or not the intersection parameters are present in the design models. And the representation just now was that they were not in the prior art, and that the innovation here was to place them in the design models. So I'd first direct the court to the patent and what the patent actually says. In the abstract, the abstract refers to existing design models and the use of existing design models. And Column 2 is very clear. The systems and methods, I'm sorry, Line 3 of Column 2, of the present invention may be based on information included as part of existing computer-aided designs. So this is an invention that replaces the human operator who previously sat between the CAD design and took that information out to feed it to the manufacturing machine. What's been replaced there using the same design models and going to the same machines is a set of these generic computer components. Why isn't this patent broad enough to cover a CAD-designed box, a metal box that's produced using markings and then put on the line and manufactured? At the level of abstraction that these claims are recited, Your Honor, I agree with you we would appear to cover that. I hadn't considered your question with respect to an auto manufacturing line. I'm not sure I know enough about it to answer that question competently. Well, I probably don't know enough to ask the question, but just from what I've seen. It certainly is not limited to any specific setting. And I'd actually like to talk a little bit to where counsel started about manufacturing. Manufacturing here appears at the very end of this claim. It is fully in the category of a post-solution activity that this court has addressed in many of its cases. Counsel emphasized that many of this court's cases in this area about information processing take place in the digital realm, and there was an effort to contrast this case from those digital realm cases. If you go and look at the claim, what's happening here is we start with a CAD file. That is, by definition, a digital file. And then we're identifying information, potentially manipulating that information or simply just copying it out and then passing it electronically to a machine that accepts electronic input. Everything about what I just said takes place in the digital realm. There's no physical aspect to any of that. It starts and finishes with electronic manipulation of data. And that's well within this court's decisions in electric power group, content extraction, University of Florida. All of those are about identifying data, processing data, and passing it from one place to another, which is what this claim concerns. Go ahead. Keep going. The last point I wanted to address about whether the invention concerned adding. Let me just interrupt you for a second. In your first step, I would say it's not identifying data. It's asking someone else to identify data, which is why I said it was a question. I think part of what I was about to say goes to that, Your Honor, because there is some ambiguity as to what counsel is saying is the innovation. Is the innovation that somehow intersection parameters will now already be in the design model? And if that's the case, then the question is, well, how did they get there? Because the patent doesn't describe that. And what shows up in the claim is that there's an identifying step that happens after the design model has already appeared. And so this claim, Claim 7, which is representative of all the claims at issue, has an identifying step. If the intersection parameter information is already there, then the identification step doesn't do anything. It's just copying. And then we're just copying data from one place to another. So with respect to whether or not there are intersection parameters in the design models of the invention, counsel pointed to Columns 5 and 6, and I believe that's where you were referencing, Judge Chen. What those passages say is that the design model typically includes information like intersection parameters. And if the entire novelty of this invention was to add intersection parameters to design models that had never had them before, typically is a very odd word to use to convey that. It is describing, consistent with the abstract and Column 2, which discusses existing design models, consistent with the idea that intersection parameters were present in design models. And one example of that can be found in Column 4. Column 4, Line 25, refers to a bolt's fixing point, essentially a bolt hole. That's an intersection parameter. That's what Column 4 at Line 25 says. That's an example of an intersection parameter. And there's no dispute that bolt holes were part of CAD design models. So what we're left with is where is the inventive step, the inventive concept that could save this at Step 2? Let's just assume the patent's ambiguous about whether conventional design models included the intersection parameters. So sure, suppose you take the method argument and say this was novel, or this was the inventive element. So first, then there's no need for the identifying step in the claim. The claim doesn't describe how that information gets there. So perhaps they have some innovation where they found a way to improve design models and make an improved design model that has intersection parameters built in. That's not disclosed in this patent, and it's not claimed in this patent. So it can't provide the inventive concept that would get this claim to survive Step 2 of ALICE. And if it's something else, if it's the identifying step, there's a lot in the briefs about the declarations from their expert and their inventor about how a person of skill would know that there are algorithms you could use to identify intersection parameters. That's not in the patent either. There's nothing said about this other than identifying takes place. There's no specific algorithm claimed. It's any kind of identification. And they're very clear about this. In the reply brief at page 26, it says the improvement does not depend on the algorithm for identifying intersection parameters. So whatever this purported innovation might be, if it's about finding the intersection parameters earlier and putting them in a design model, not claimed, not disclosed in the patent. If it's about the identifying step, any method will do. Any possible way of doing this on a computer is covered, and that's the preemption problem. What about the story from the other side? It's not quite clearly made in the patent itself, but the story that the manufacturing process gets done differently when you are so fortunate enough to have the intersection parameter information transmitted directly to the manufacturing machine. You don't have to take things off the assembly line or something like that, hoist things. There's two pieces to that. First is something that counsel said earlier, that these machines were altered. They've said that in their briefs also, that the machines are specially adapted in some way to incorporate this new information. You won't find anything in the patent that discusses that at all. The discussion of manufacturing machines in the patent is fully consistent with the manufacturing machines of the prior art. This invention is about replacing what's in the middle between the CAD drawing and the manufacturing machine. Actually, at appendix 1278, which is part of the Joint Claim Construction Brief, Fichet makes a reference saying that humans used to program these machines to make marks, and now the computer is going to program those machines to make marks. We're talking about the same machines that the humans used to program would now be programmed automatically by the computer. The second aspect he raised there was this idea that once you implement this process using a computer, you don't have to hoist things off the line. None of that is in the claims. There's nothing in the claims about moving any objects or changing an assembly line in any way. The only thing that's claimed is this process of translating what's in the CAD model to something to feed into the manufacturing machine. So it's just simply something that's not reflected in the claims at all or in the patent. There's no discussion of moving things on the line. And if there are no further questions, we'd rest in our briefs and ask you to affirm. Thank you. Thank you. Okay, we'll restore three minutes of your time. Thank you, Honor. I appreciate the additional time. I'd like to respond to just a few of the things there. In terms of whether it was present in the design models, it was proved not to be. So if the patent is ambiguous about is it in the design model, is it not, there was affirmative proof from PCHEP it was not in the design model. Now, Peddinghaus has access to the prior art. They could come in and say, here's the CAD model. Here's the intersection parameters in the CAD model. They weren't there in the prior art, which gets me to my next point, which is a fundamental error of the district point. You can't just transfer the data based on what was conventional. After the patent, people started including it in the CAD model, and the invention here isn't when or where the intersection parameters are identified. It's that they are identified, not done automatically before, and that they are used in the manufacturing line, which gets me to the Council's last point, which is where is it in the claim about hoisting things here and there? Fair enough. It talks about an apparatus for manufacture of an object, right? So there's your assembly line. It talks about in the second paragraph at least one manufacturing machine to make the component. That's your manufacturing line. Typically it's at least four or five machines, but the claim says at least one. And then it talks about manufacturing the component. That is your manufacturing line, and the reason you can do it without hoisting it to do the marking is because we have a machine that's adapted to receive the instructions. Here's what confuses me. In column five, in the detailed description, it says, if the object to be manufactured is an architectural structure representing a shed, and then it goes through. And it doesn't stop just saying this is how CAD works. It goes on to say it can be manufactured without human intervention, right? Is that not something that can be manufactured using this patent? Is a shed something that could be? Yes. In practice what tends to happen is the objects tend to be not the whole shed but a wall for the shed. But yes, if this patent would cover that, yes. Assuming the limitations are all met. Yeah, and it would cover a box, and it would cover those auto body parts. So assuming the limitations are met, which is great, because the context of the invention, the context of everything that's conventional, the context of every infringement has all been manufactural steel, I-beams. But if this invention has broader application, the claims would cover that, and that does not remove it from Section 101. A broad claim is not a Section 101 ineligible claim. So it identifies an actual improvement to manufacturing that has plain application for manufactured steel, which is the example in the patent, and it has broader application which everybody who drafts patent claims know. Would I like a picture claim here? Of course. But that's not what we have. But that doesn't make it not patentable. And I'm down to 17 seconds. I'll answer, of course, any other questions. You're over. Thank you, Your Honor. Oh, thank you.